## Blackburn *v.* The Selma R. Co.

*(Circuit Court, W. D. Tennessee. ———, 1880.)*

1. Judicial Sale—Advance Bid—Payment Into Court.—In an application to set aside a judicial sale upon the ground of gross inadequacy of price, it is not essential that the amount of the advance bid should be actually paid into court.

2. Same—Same.—It is essential, however, that such advance bid should be absolute and unconditional.

3. Same—Same—Equity Rule 19.—Under equity rule 19, adopting the practice of England so far as it is consistent with " our local circumstances and conveniences," a third person can intervene and have a sale set aside, upon offering a sufficient advance in price and paying all the expenses incurred by the previous purchaser.

4. Same—Same.—It would seem, however, that such advance bid should be sufficient to afford substantial evidence that for some, perhaps unknown, reason the property has been greatly undersold; so much so that the purchaser has not simply a bargain, with a fair margin for profit, but an unconscionable advantage of the parties for whose benefit the sale was made.

5. Same—Same—Personal Property.—A sale of personal property, under a decree of foreclosure, may be set aside for an advance of price, before the same is confirmed.

6. Same—Same—Costs.—The costs and expenses to be paid by the advance bidder cannot be fixed for all cases, but must depend in each case on its own circumstances.

7. Same—Same—Resale.—In seems that the resale should conform to the method of the original sale, upon such notice as the court may prescribe, having in view to advertise the fact that the former bids have not been accepted, and that a resale will be had, commencing at the amount of the advance bid offered.

8. Same—Resale—First Purchaser.—The first purchaser is entitled to increase his bid in open court to the amount of the advance bid, and claim a preference, but this preference cannot be extended upon a still further advance of the bids.

    *Morton* v. *Sloan*, 11 Humph. 278.

*Smith & Collier,* for applicants.

*Estes & Ellett,* for purchasers.

HAMMOND, D. J. The special master in this case reports that in pursuance of the decree of sale heretofore made he has sold the Selma, Marion & Memphis Railroad, ⁑ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ ⁂ constructed and to be constructed, with the railways, rails, bridges, engines, cars, etc., including 81 bonds, of $1,000 each, of the city of Aberdeen, Mississippi, mentioned in the mortgage and decree of sale; that J. J. Busby became the purchaser of the railroad at the sum of $1,500, and Horace E. Andrews of all the bonds, at the sum of $510; and that the purchase money has been deposited in the registry of the court, according to the terms of the decree of the sale.

S. H. Lamb and W. F. Taylor respectively offer to advance the biddings; the former to give $2,000 for the railroad, and the latter $750 for the Aberdeen bonds. W. A. Collier, one of the creditors, has filed his petition, setting forth these offers, and prays that the biddings may be opened and a resale ordered. Subsequently, Lamb, on condition that, if he does not become the purchaser, whatever costs he may pay in the matter shall be refunded, offers to advance the bid to $3,000 for the railroad. No attack is made upon the conduct of the sale, and this application is based solely upon the gross inadequacy of the price which has been realized. These proposed bidders offer to pay their bids in on such terms and conditions as the court may impose. It is no serious objection to entertaining this application that the money has not been actually paid into court along with the offer to advance the biddings. It is, I believe, the Tennessee practice to do this, the object being to secure a sale at all events, if a resale should be ordered. This can be accomplished, however, by requiring payment before decree of resale, and there is an objection to paying the money at the time of making the application, not applicable to the state courts, in this, that all money paid there must go into the registry, and in paying out the clerk becomes entitled to commissions, so that if the bid is not accepted and the application refused, the

applicant would be taxed with unnecessary costs. I think, therefore, the application should be heard, and it will be time enough to order the money paid when the biddings are opened. In the latest case on the subject the supreme court of Tennessee has said that the applicant should not be repelled upon the mere form of his application, and overruled the objection that the money was not paid in along with the offer. *Lucas* v. *Moore*, 2 Lea. 1. That case also decides that the offer must be unconditional, and manifestly the court cannot, in this proceeding, traffic with the proposed purchaser as to the terms on which the resale shall be made or attempted. The terms of sale are already fixed by decree, and they must be complied with, the costs being left, as in all cases, to be determined in its legal discretion by the court. The conditional offer of $3,000 cannot, therefore, be considered.

The debts to be paid in this case amount to $219,170, and from the description of the property as found in the mortgage, the bill, and the decree of sale, one would infer that its value should be millions of dollars, and the prices offered are calculated to shock the conscience of any court, and provoke a conclusive presumption of some fraud, accident or mistake, sufficient to summarily set aside the sale; and I should have no hesitancy in refusing, on my own motion, to confirm this sale, but for the explanation found in the statements made at the bar, that the 45 miles of finished and equipped road in Alabama is subject to a prior lien, and is already in the adverse possession of parties claiming under that lien, and supported by decisions of the Alabama courts likely to sustain their claim; and that the liability of the city of Aberdeen on the bonds is contested, and, under decisions of the Mississippi courts, likely to be altogether defeated. Notwithstanding these facts, which find support in the smallness of the advanced bids here made, it seems to me that the circumstances warrant the court in the conclusion that this property has not sold for its value, and that, if possible, there should be a resale.

I am fully impressed with the importance of supporting the

rights of purchasers at judicial sales where they have been fairly conducted, and believe that want of stability in such sales is a most serious evil. The mere fact that a man has made a bargain at such a sale should not induce the court to recede on its part, whatever its power to do so may be. The practice in England on this subject became so notoriously disastrous that first the court by rule, and then parliament by legislation, interfered to break it up and establish a system of reserved bids, which answers the purpose of securing the highest price, and protects the sale from the chilling influences of instability and uncertainty.

The court now, upon application of the parties, or of its own motion, ascertains the probable value of the property as nearly as may be, and, having determined the lowest price it is willing to take, the property is not sold, unless at public auction, it brings as much, or more, than this reserved price, which, not being revealed until after the sale, cannot influence the biddings. 1 Sug. Vend. (8th Ed.) 136, 161, 163; 2 Danl. Ch. Pr. (5th Ed.) 1286 and note; see 3 Southern Law Rev., 423. Under this system, which was first adopted by general order of the court in 1851, and subsequently perfected in 1867, by 30 and 31 Vict. 48, the biddings are not opened for any advance of price unless there be either fraud or such misconduct as borders on fraud. *Delves* v. *Delves,* (Law Rep.) 20 Eq. 77. If congress or the supreme court, under its power to prescribe equity rules, should conform our practice to this improved method of making chancery sales, it would relieve the courts of much embarrassment; for, as was said by Mr. Justice Miller, "the act of confirming or setting aside a sale made by a commissioner in chancery often involves the exercise of judgment and discretion as delicate as that called for by any function which belongs to the court." *Railroad Co.* v. *Soutter,* 5 Wall. 660, 662. Where there are no circumstances of fraud or misconduct the difficulty is increased, and has always been a perplexing subject with all courts.

The ninetieth equity rule binds us to the practice as it existed in England when the equity rules were first promulgated

in 1842, so far as it is consistent with "our local circumstances and conveniences." In Tennessee, before confirmation, the rule is now settled that a simple advance of 10 per centum, without any circumstances whatever of fraud, accident or mistake, shall be sufficient to open the biddings, and that the practice must be liberally applied to effectuate the purpose of procuring the largest possible price. *Click* v. *Burris*, 6 Heisk. 539; *Glenn* v. *Glenn*, 7 Heisk. 367; *Lucas* v. *Moore*, 2 Lea. 1; *Atkison* v. *Murfree*, 1 Tenn. Ch. 51; *Insurance Co.* v. *Hamilton*, 3 Tenn. Ch. 228; *Vaughan* v. *Smith*, Id. 368; *Atchison* v. *Murfree*, Id. 728.

In England, before the new practice was adopted, a third person could, upon no other ground than that he offered an advance of price, provided it were a considerable advance, intervene and set the sale aside, he paying all the expenses which the previous purchaser had incurred, and the property was put up for sale upon the advance price. There was no rule as to the amount of the advance required, and no one had any right to open the biddings, since it was always in the discretion of the court to grant the application or refuse it. 1 Sug. Vend. (8th Am. Ed.) 163; 2 Danl. Ch. Pr. (5th Am. Ed.) 1286; *Barlowe* v. *Osborne*, 6 House of Lords Cases, 555, 559; *Garstone* v. *Edwards*, 1 Sim. & Stu. 20; *Brookfield* v. *Bradley*, Id. 23; *Watson* v. *Birch*, 2 Ves. 51; S. C. 4 Bro. C. R. 178; *Upton* v. *Lord Fenus*, Id. 700; *Andrews* v. *Emerson*, 7 Bro. C. R. 420; *Morice* v. *The Bishop of Durham*, 11 Bro. C. R. 67; *White* v. *Wilson*, 14 Bro. C. R. 151; *Farlow* v. *Weildon*, 4 Madd. 243; *Williams* v. *Allenborough*, 1 Tenn. Russ, 70; Anon. 1 Ves. 453, and notes.

These authorities abundantly establish that an advance of price as great as that offered in this case always sufficed to set the sale aside and order a resale, no matter how fairly conducted it had been. It was this practice that was so severely condemned by the English courts as inexpedient, ruinous and unjust, and the law lords, in *Barlowe* v. *Osborne*, *supra*, expressed the wish that occasion would be taken, either by act of parliament or by order of court, to put a stop to it, which, as we have seen, was afterwards done. And, under

the influence of universal condemnation, the American courts have generally refused to follow it, and adopted in its stead the rule that there must be, besides an advance of price, some circumstance of unfairness in the sale, growing out of fraud, accident, mistake, or trust relation of the parties, sufficient to avoid a sale between private parties. 4 Kent, (12th Ed.) 192; 1 Sug. Vend. (7th Ed.) Perkins' Notes, 93; *Williams* v. *Dale*, 3 J. C. 390; *Duncan* v. *Dodd*, 2 Paige, 99; *Am. Ins. Co.* v. *Oakley*, 9 Paige, 259. This is the doctrine which most commends itself to my judgment as being just and fair to all concerned, but I think this court must follow the English practice, particularly as the "local circumstances and conveniences" mentioned in the ninetieth equity rule favor it, and we have no power to resort to the method of reserved bids established in England since the equity rules were promulgated.

Perhaps the court should not lose entire control of these sales in all cases where inadequacy of price appears as the only ground of objection to its confirmation; and, until the practice is in some way satisfactorily regulated, the best solution of the subject seems to be to hold closely to the public policy which protects the sales against instability by refusing to set them aside, unless the price offered in advance is so great, in proportion to the bid already made, that it affords substantial evidence that for some, perhaps unknown, reason the property has been greatly undersold; so much so that the purchaser has not simply a bargain, with a fair margin for profit, but an unconscionable advantage of the parties for whose benefit the sale has been made. A similar principle sometimes prevails to avoid a sale between private parties. Bisph. Eq. 275. I think this sale is of that character, looking solely to the prices now offered as a criterion, in connection with the seemingly speculative character of the property itself; and it may be fairly inferable from the circumstances that on a resale it will bring a much larger sum even than is now offered.

But it is insisted that this practice of opening the biddings for a mere advance of price does not apply to personal prop-

erty, and, therefore, the sale of the Aberdeen bonds cannot be set aside unless there be alleged and proved some circumstance of unfairness arising out of fraud, accident, mistake, or trust relation of the parties. The argument is that as to personal property confirmation of the sale by the court is not necessary; that the title passes when the property is struck off to the bidder, and, therefore, the sale stands before confirmation as a sale of land does after confirmation; in which case, it is now well settled by the authorities above cited, that there must be, besides an advance, some other circumstances making the sale unfair, and for which it will be set aside. *Morice* v. *The Bishop of Durham,* and *White* v. *Wilson, supra;* 4 Kent, 192, (12th Ed.)

The case relied on to support this position is *Saunders* v. *Stallings,* 5 Heisk. 65, where Chief Justice Nicholson says: "In the sales of personal property under decrees of the chancery court it has become the settled law of the state that the title to the property passes to the purchasers, as soon as the contract is completed, by his bid being accepted by the master." It was a case of loss by fire of some houses and machinery to be detached from the realty that were sold by the master, and burned before confirmation, the loss being thrown by the decision on the vendee. In *Johnson* v. *Johnson,* 2 Heisk. 522, the same learned judge reviews the authorities in Tennessee, says they are not uniform, and rules that the loss by emancipation of slaves between sale and confirmation must be on the vendor. And so he subsequently ruled in *Jones* v. *Hollingsworth,* 10 Heisk. 653. Mr. Chancellor Cooper, in *Atkison* v. *Murfree,* 1 Tenn. Ch. 51, 54, calls attention to the unsettled condition of the law on this point in this state, and says that the latest decisions relating to sales of personalty seem to restore the symmetry of the law, and make the title depend on confirmation. Page 54. In *Blossom* v. *Railroad Co.* 3 Wall. 196, 207, the supreme court affirms what is said by Judge Story in *Smith* v. *Arnold,* 5 Mason, 414, 420, that in sales directed by a court of chancery the whole business is transacted by a public officer, under the guidance and superintendence of the court itself. Even after

the sale is made it is not final until a report is made to the court and it is approved and confirmed. It is said, also, that the purchaser becomes a party to the suit, to represent and defend his own interest, and is subject to the orders of the court made in that behalf. Id. S. C. 1 Wall. 655. And in *Williamson* v. *Berry*, 8 How. 495, 546, it is said these cautionary proceedings may be dispensed with by special order of the chancellor to pretermit them, but such are the proceedings when no special order is given.

I do not find in the books or cases any distinction between sales of realty and personalty in regard to the control of the court over the sale, for the purpose of receiving, before confirmation, an advance bid. It is conceded on all hands that the court may, if any fraud intervenes, summarily, before confirmation, and by petition at the same time, after confirmation, set the sale aside. See *Savery* v. *Sypher*, 6 Wall. 157. This must be on the principle that the sale is not, till confirmation, in all respects final, and fully recognizes the control of the court until confirmation over the parties and the property. I see nothing to prevent the court taking the same control when the law sanctions a resale for an advance of price, as well as when it requires a resale in case of fraud or other misfortune in the conduct of the sale. It is, after all, so far as relates to this matter of confirmation, not a question of title, but one of practice, as to the proper mode of exercising the control of the court over the sale. Whether the title passes or not the court can set aside the sale under certain circumstances. If the control of the court over the property and parties has not been terminated by final confirmation the resale may be ordered summarily, and plenary proceedings by bill are unnecessary; if it has there must be such plenary proceedings. The authorities are settled that, after confirmation, no mere advance in price will suffice to open the biddings, however the application is made; but this is a rule of discretion, and not dependent on the title the purchaser has acquired. If the rule of discretion were otherwise the court could, at the same term, the confirmation being set aside, order a resale, and it was the constant practice in

England to do it until the pernicious effects of the practice caused the courts to fix upon the confirmation as the point at which its negotiations for a larger price would cease. The title of the purchaser never prevented the court from assuming control after confirmation, but public policy induced it to say that after that event the sale should stand, except for fraud or misadventure of some kind. I am, therefore, of opinion that too much importance has been sometimes attached to the process of confirmation; and certainly it will not do to extend the consideration for the purchaser's title in a case of the loss of the property, when the question is who shall bear it, to the matter of the control of the court over the sale for the purpose of procuring a larger price. It seems to me, in all cases, the purchaser, whatever may be the character and incidents of his title and ownership, must be understood to be under the control of the court until confirmation, and liable to have his purchase vacated if some one will give enough larger sum to induce the court to refuse the first offer.

Now, personal property may sometimes be perishable, or subject to such fluctuations of value or other contingencies as would make an absolute sale desirable to all concerned, or it may be an imperative necessity. If so, the court can pretermit its subsequent control and direct an absolute sale, as is clearly suggested may be done in *Williamson* v. *Berry, supra.* Mostly the chancery courts deal with real estate, and, comparatively, they are seldom called upon to sell personal property, though their jurisdiction is now much oftener invoked for that purpose than formerly, and for this reason it may be that the cases on confirmation of sales and opening of biddings are almost entirely cases of sales of real estate, as stated at the bar; but I cannot infer from this that the practice is confined to real estate, and I think if so important a distinction existed the books would have called attention to it.

Unquestionably the courts do, in sales of personal property, exercise more caution in vacating sales; nevertheless, they do require confirmation, and may be set aside solely for an advance of price. The case of *Anson* v. *Twogood*, 1 Jac.

& Walk. 637, is an instance where confirmation was required. There the sale was of a life interest in consols and annuities, and the question was who was entitled to the dividends on the consols earned in the *interim* between sale and confirmation. Lord Eldon gave them to the purchaser, on the doctrine that after confirmation the sale related back to the day of sale. This is no doubt the true solution in all these cases of the troublesome questions growing out of the nature of the purchaser's title between sale and confirmation. If confirmed he must be treated as the owner from the day of sale, entitled to profits and subject to losses, unless there be some equitable circumstance in the case that induces the court, in the exercise of its power over the contract, to change the rule and withhold the profits, or exempt him from the loss. But in any event the control of the court over the sale is the same, whatever the rights of the purchaser may be. Lord Eldon says nothing can be predicated on the confirmation in determining to whom the dividends belong. Lord Chancellor Ludgen approves this case in *Vesey* v. *Elwood*, 3 Drury & Warren, 74, and Judge Dillon in *Lathrop* v. *Nelson*, 4 Dill. 194. The case of *Twigg* v. *Fifield*, 13 Ves. 517, was the sale of an annuity, and confirmation was required. Mr. Sumner, in citing these cases in his note to *Ex parte Minor*, 11 Ves. 559, 562, says: "A purchaser, no doubt, until the master's report is confirmed, is always liable to have the biddings opened."

Where a colliery, which is in the nature of a trade, has been the subject of sale, a proposal to open the biddings will be listened to with extreme caution, as, from the hazardous nature of such a concern, delay may occasion ruinous loss. Anon. 1 Ves. 453, note; *Wren* v. *Kirton*, 8 Ves. 502.

The biddings were opened in the sale of a steam-boat for an advance of price, and after confirmation re-opened because of misconduct at the first sale. *Moore* v. *Watson*, 4 Cold. 64. And in *Owen* v. *Owen*, 5 Humph. 352, the sale of a slave was set aside for inadequacy of price and because the slave was sick.

Judge Benedict, proceeding in admiralty according to the practice in equity, set aside the sale of a steam-boat, worth

$8,000 and sold for $1,000, upon the ground of gross inade-juacy of price, coupled with circumstances of surprise to the party applying. *The Sparkle*, 7 Ben. 528, 536.

There is another view of this question which is conclusive in favor of the continued control of the court over this sale of these bonds, even if the position be correct that, generally, as to personal property, the sale is complete when the property is struck off to the highest bidder. Decrees of foreclosure and redemption, or of sale with redemption barred, require confirmation of the sale to complete them. 2 Danl. Ch. Pr. 997, 998. They are final in the sense of being in a condition to be appealed from without waiting for a confirmation, but the sale is in the nature of an execution of the decree, and the judgment of the court confirming or refusing confirmation may also be appealed. Id., and notes. Vice Chancellor Wigram says whether a report needs confirmation depends upon the terms of the order and the nature of the subject, and not upon the proceedings on which the reference is made. 2 Danl. Ch. Pr. 1304; *Otley* v. *Pensam,* 1 Hare, 322. The supreme court has also said that if a decree in terms requires a report of a master to be confirmed, until confirmation it cannot be acted on. *Gray* v. *Brignardello,* 1 Wall. 627. The decree of sale in this case requires, in terms, that the sale shall be confirmed to bar the equity of redemption, and the sale cannot, therefore, be complete without it. The equity of redemption applies as well to the bonds as the other property. 1 Schouler's Pers. Prop. 553, 555; 2 Hilliard Mort. Appx. 2, § 38; Story, Eq. § 1033; *Freeman* v. *Freeman,* 2 C. E. Green, 44; *Wilson* v. *Brannan,* 27 Cal. 258, 259.

But the biddings are never opened without requiring the applicant to pay the costs and expenses of the first purchaser, and we are asked to designate what are to be included in such allowances. The theory seems to be that he must be made whole and depart from the court without the least loss to him. The court refuses to specify any particular allowances, and if the parties cannot agree refers the matter to a master to ascertain and fix the allowance according to the facts of the case and the practice of the court. In one case

Judge Nelson allowed counsel fees where he set a sale aside by consent, though it was not for any inadequacy of price. 2 Danl. Ch. Pr. 1291, 1292; 2 Newl. Ch. 386; Anon. 2 Ves. 286; *The Sparkle*, 7 Ben. 528, 536; *Drake* v. *Goodridge*, 6 Blatchf. 531. Interest on the first purchaser's money is an element of expense to be allowed, and with us, where all money going into the registry pays a commission on disbursement by the clerk, that should be also allowed. The authorities all say that the applicant must also pay the costs incident to his application; but this does not include the ordinary costs either of the original sale or the resale. In *Farlow* v. *Weildon*, 4 Madd. 243, *supra*, the application was refused because the advance was not enough to pay the costs of advertising the sale, which shows that it is to be paid by the fund. These costs and expenses to be paid by the bidder cannot be fixed for all cases, but must depend in each case on its own circumstances.

There is a question made as to the mode of conducting the resale, whether it shall be again by public auction as before, and on the same terms as to notices as in the original decree, or by simply invitory bids before the master in his office. In England the resale was conducted precisely as the original sale, and both were by biddings before the master, entered in a book signed by the bidders, and continued until the biddings were ended. "Opening the biddings" was simply a continuation of this process, but, obviously, it is inapplicable to our method of selling at public outcry, and I think our resales should conform to the method of the original sale. But as to the notices, the requirements of the mortgage having been complied with in the original decree, and this being only a resale, and but a continuation of the former sale, I am of opinion the resale may be made on such notice as the court may prescribe, having in view to advertise the fact that the former bids have not been accepted, and that a resale will be had, commencing at the amount of the advanced bid now offered. Let a decree be drawn opening the biddings upon the payment into court of the amounts offered, the payment to the first purchaser of his allowances for expenses, includ-

ing interest and commissions for disbursement, and the costs of the application. Proper directions as to advertisement will be indicated when the decree is drawn.

———————

Upon announcing the foregoing decision the first purchasers, in open court, offered to increase their bids, respectively, to the same amounts as those advanced, and claim a preference. I think they are entitled to this. Unless the applicants make a further advance the biddings will not be opened. *Morton* v. *Sloan*, 11 Humph. 278. The report of sale will be amended to show that the first purchasers bid the amounts now offered, and the further hearing of the application is postponed to allow time for a further advance. Subsequently, there being another advance of $500, the first purchaser offers the same sum, and moves for a confirmation unless there shall be a still further advance. I do not think this preference to the first purchaser can be further extended. I find no authority for it except *Morton* v. *Sloan*, *supra*, and I am not disposed to extend it beyond that case, for the obvious reason that the resale would be confined to these two persons, and the practice degenerates into a mere auction by the court to only two bidders, with an advantage to one of an option to take the property at whatever price the other is willing to give. I do not think consideration for the first purchaser demands that he should have this preference, as it results in leaving to him, and not the court, the determination of the question whether there shall be a resale. It is true that a re-sale is not a matter of right in the advance bidder; that the court may stipulate for the price on a resale, and this process may force the applicant to offer the most he is willing to give, and thus, in some degree, there may be a guaranty against trivial applications to open the biddings; but, finding no warrant for the practice thus indicated, I cannot engraft on the settled practice, which I feel bound to follow, notwithstanding my aversion to it.